**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

ERLINDA M. SAIZ,

      Plaintiff,

   vs.                                                    CIV No. 21-0681 KRS

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,

      Defendant.

**<ins>MEMORANDUM OPINION AND ORDER</ins>**

THIS MATTER is before the Court upon Erlinda M. Saiz's ("Plaintiff's") Motion to

Reverse and Remand for a Hearing with Supporting Memorandum (Doc. 17), dated January 21,

2022, challenging the determination of the Commissioner of the Social Security Administration

("SSA") that she is not entitled to supplemental security income under Title XVI of the Social

Security Act, 42 U.S.C. §§ 1381-83f. The Commissioner responded to Plaintiff's Motion on

April 18, 2022 (Doc. 21), and Plaintiff filed a reply brief on May 9, 2022 (Doc. 23). With the

consent of the parties to conduct dispositive proceedings in this matter, *see* 28 U.S.C. § 636(c);

FED. R. CIV. P. 73(b), the Court has considered the parties' filings and has thoroughly reviewed

the administrative record. Having done so, the Court concludes that the ALJ did not err in her

decision and will DENY Plaintiff's Motion.

## I. PROCEDURAL POSTURE

On May 30, 2019, Plaintiff filed an initial application for supplemental security income

alleging disability due to depression, anxiety, bipolar disorder, post-traumatic stress disorder,

attention deficit and hyperactivity disorder, ankylosing spondylitis, fibromyalgia, asthma, and

arthritis of the hips, lower spine, and tail bone. (*See* Administrative Record ("AR") at 205-06).

Initially, Plaintiff alleged that she had become disabled on August 31, 2015 (AR at 28, 206);

however, she later amended her alleged onset date to May 30, 2019 (AR at 28-29). Plaintiff's

application was denied at the initial level (*id.* at 206-16), and at the reconsideration level (*id.* at

218-26). Plaintiff requested a hearing (*id.* at 260-62), which ALJ Jennifer Fellabaum conducted

telephonically on January 14, 2021 (*see id.* at 26-50). Plaintiff was represented by counsel and

testified at the hearing, as did vocational expert Leslie White (the "VE"). (*Id.*).

On February 9, 2021, the ALJ issued her decision, finding that Plaintiff was not disabled

under the relevant sections of the Social Security Act. (*Id.* at 230-41). Plaintiff requested that the

Appeals Council review the ALJ's decision (*id.* at 8-10), and on June 15, 2021, the Appeals

Council denied the request for review (*id.* at 1-3), which made the ALJ's decision the final

decision of the Commissioner. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). On

July 22, 2021, Plaintiff filed the Complaint in this case seeking review of the Commissioner's

decision. (Doc. 1).

## II.  LEGAL STANDARDS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining "whether

substantial evidence supports the factual findings and whether the ALJ applied the correct legal

standards." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) (citing *Lax v. Astrue*, 489

F.3d 1080, 1084 (10th Cir. 2007)); *see also* 42 U.S.C. § 405(g). If substantial evidence supports

the ALJ's findings and the correct legal standards were applied, the Commissioner's decision

stands and the plaintiff is not entitled to relief. *See, e.g.*, *Langley v. Barnhart*, 373 F.3d 1116,

1118 (10th Cir. 2004). Although a court must meticulously review the entire record, it "may

neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]." *See,
e.g.*, *id.* (quotation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)
(quotation omitted); *Langley*, 373 F.3d at 1118 (quotation omitted). Although this threshold is
"not high," evidence is not substantial if it is "a mere scintilla," *Biestek*, 139 S. Ct. at 1154
(quotation omitted); "if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d
at 1118 (quotation omitted); or if it "constitutes mere conclusion[,]" *Grogan v. Barnhart*, 399
F.3d 1257, 1261-62 (10th Cir. 2005) (quotation omitted). Thus, the Court must examine the
record as a whole, "including anything that may undercut or detract from the ALJ's findings in
order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262 (citation
omitted). While an ALJ need not discuss every piece of evidence, "[t]he record must demonstrate
that the ALJ considered all of the evidence," *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir.
1996) (citation omitted), and "a minimal level of articulation of the ALJ's assessment of the
evidence is required in cases in which considerable evidence is presented to counter the agency's
position." *Id.* at 1010 (quotation omitted). "Failure to apply the correct legal standard or to
provide this court with a sufficient basis to determine that appropriate legal principles have been
followed is grounds for reversal." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984)
(quotation and citation omitted).

## B.  Disability Framework

"Disability," as defined by the Social Security Act, is the inability "to engage in any
substantial gainful activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The SSA

has devised a five-step sequential evaluation process to determine disability. *See Barnhart v.*

*Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051-52 (10th Cir. 2009); 20

C.F.R. § 404.1520. If a finding of disability or non-disability is directed at any point, the SSA

will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the

ALJ considers the claimant's current work activity and the severity of her impairment or

combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the

Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most

that she is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1). At

step four, the claimant must prove that, based on her RFC, she is unable to perform the work she

has done in the past. *See Thomas*, 540 U.S. at 25. If the claimant meets "the burden of

establishing a prima facie case of disability[,] . . . the burden of proof shifts to the Commissioner

at step five to show that" the claimant retains sufficient RFC "to perform work in the national

economy, given [her] age, education and work experience." *Grogan*, 399 F.3d at 1261 (citation

omitted); *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the

five-step sequential evaluation process in detail).

### III.  THE ALJ'S DETERMINATION

The ALJ reviewed Plaintiff's claim pursuant to the five-step sequential evaluation

process. (AR at 230-41). First, ALJ Fellabaum found that Plaintiff met the SSA's insured status

requirements through the relevant period and had not engaged in substantial gainful activity

since May 30, 2019, her application date. (*Id.* at 232). The ALJ then found at step two that

Plaintiff suffered from the following severe impairments: ankylosing spondylosis, knee

osteoarthritis, obesity, bipolar disorder, attention deficit hyperactivity disorder ("ADHD"),

anxiety disorder, and post-traumatic stress disorder ("PTSD"). (*Id.*). Additionally, she found that

Plaintiff suffered from medically-determinable, non-severe impairments: asthma, hypertension,

migraine headaches, hepatitis C, thyroid nodule, substance abuse disorder, obstructive sleep

apnea, and temporomandibular joint disorder. (*Id.*) At step three, the ALJ concluded that Plaintiff

did not have an impairment or combination of impairments that met the criteria of listed

impairments under Appendix 1 of the SSA's regulations. (*Id.* at 233).

Moving to the next step, the ALJ reviewed the evidence of record, including medical

opinions and evidence from treating and consulting providers, prior administrative findings, and

Plaintiff's own subjective symptom evidence. (*See id.* at 236-39). Having done so, the ALJ

concluded that for the relevant period, Plaintiff possessed an RFC to

> perform light work as defined in 20 [C.F.R. § 416.967(b)] except she can
> occasionally stoop, crouch, kneel, crawl, and climb ramps and stairs; she can never
> climb ladders, ropes, and scaffolds or be exposed to unprotected heights, hazardous
> machinery, or concentrated exposure to environmental irritants or extreme cold;
> she can perform simple routine tasks, with no fast paced production work; she can
> make simple work decisions; she can occasionally interact with the general public,
> co-workers, and supervisors; and her work should be performed in the same
> location every day.

(*Id.* at 236).

After determining that Plaintiff had "no past relevant work," the ALJ proceeded to step

five, where she determined that Plaintiff could perform other jobs existing in significant numbers

in the national economy. (*Id.* at 239-40). The ALJ ultimately concluded that Plaintiff's work was

not precluded by her RFC and that she was not disabled since May 30, 2019. (*Id.* at 240).

## IV.  DISCUSSION

In her Motion to Remand, Plaintiff contends that the ALJ (1) failed to properly assess the

prior administrative findings of a state agency psychological consultant (*see* Doc. 17 at 5-12); (2)

failed to account for her subjective allegations of pain and other symptoms (*see id.* at 12-18); and

(3) failed to develop the record regarding her fibromyalgia (*see id.* at 19-22). The Court disagrees with each of these arguments and with Plaintiff's sub-arguments and will therefore deny Plaintiff's motion.

### A.  Evaluation of Dr. Wewerka's Opinions

In her first claim, Plaintiff argues that the ALJ failed to properly assess the findings of Renate Wewerka, PhD, the state agency psychological consultant who initially reviewed her claim. (Doc. 17 at 5-12). Because Plaintiff applied for disability benefits after March 27, 2017, ALJ Fellabaum was required to evaluate medical opinions in Plaintiff's case under the revised regulations found in 20 C.F.R. § 416.920c. *See Zhu v. Comm'r, SSA*, No. 20-3180, 2021 WL 2794533 at *4 & n.8 (10th Cir. July 6, 2021). Medical opinions from state agency consultants, like Dr. Wewerka, are classified as "prior administrative findings[,]" but the rules for weighing them are the same as for weighing medical opinions. *See Vigil v. Saul*, No. CV 20-632 CG, 2021 WL 2117184, at *5 (D.N.M. May 25, 2021) (citing 20 C.F.R. §§ 404.1531a, 404.1520c); *see also* 20 C.F.R. § 416.920c(a)-(c)); 20 C.F.R. § 404.1513a ("Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."). Under the revised regulations, no specific evidentiary weight or deference is given to medical opinions or prior administrative findings. *See* 20 C.F.R. § 416.920c(a). Instead, they are evaluated on equal footing using the factors enumerated in the regulations. *See* 20 C.F.R. § 416.920c(c)(1)-(5).

The revised regulations do, however, impose "articulation requirements" on an ALJ. *See* 20 C.F.R. § 416.920c(b). First, "when a medical source provides multiple medical opinion(s),"

the ALJ need not articulate how he considered each individual medical opinion, but he must "articulate how [he] considered the medical opinions . . . from that medical source together in a single analysis." 20 C.F.R. § 416.920c(b)(1). Second, an ALJ must consider five factors when evaluating medical opinion evidence, *see* 20 C.F.R. § 416.920c(c)(1)-(5); however, he is generally only required to articulate his consideration of two of those factors: supportability and consistency. 20 C.F.R. § 416.920c(b)(2). Third and finally, if differing medical opinions or prior administrative findings are equally well-supported and consistent with the record, the ALJ must then "articulate how [he] considered the other most persuasive factors . . . [,]" including the source's relationship with their client, any specialization, and other factors that tend to support or contradict the opinion or finding. 20 C.F.R. §§ 416.920c(b)(3), 416.920c(c)(3)-(5).

While the revised regulations give the ALJ some discretion in *how* she articulates her findings as to the persuasive value of prior administrative findings, they provide no leeway as to *whether* she articulates such findings. *See* 20 C.F.R. § 416.920c(b) (providing that the ALJ "will articulate in [her] determination or decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record"). In other words, although the ALJ is generally "not required to discuss every piece of evidence," *see Clifton*, 79 F.3d at 1009-10, she has, at minimum, a duty to address the persuasive value of medical opinions and prior administrative findings. *See id*. The new regulations do not alter the standard of review, though. Thus, an ALJ's persuasiveness finding "is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118 (quotation omitted), or if it "constitutes mere conclusion," *Misgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) (citation omitted). As before, an ALJ must "consider all relevant evidence in the case record," *Silva v. Saul*, No. CIV 19-913 WJ/KK, 2020 WL 4220862, at *4 (D.N.M.

July 23, 2020) (citing 20 C.F.R. §§ 404.1520b, 416.920b), and must provide the Court with a

"sufficient basis to determine that appropriate legal principles have been followed[,]" *Jensen v.*

*Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation omitted).

In resolving Plaintiff's claim as to the ALJ's treatment of Dr. Wewerka's findings, some

consideration of the administrative context in which state agency consultants complete their

assessments is helpful. Non-examining state agency psychological consultants, such as Dr.

Wewerka, prepare their medical assessment forms in the electronic Claims Analysis Tool

("eCAT"). *See Carrillo v. Saul*, No. 1:19-CV-00292-KRS, 2020 WL 6136160 (D.N.M. Oct. 19,

2020). First, they complete the Psychiatric Review Technique ("PRT"). *See id*. The PRT is used

at steps two and three of the initial-level sequential evaluation process "to determine whether a

medically determinable mental impairment(s) is severe and, if so, whether the mental

impairment(s) meets or medically equals a listed impairment." *See* Program Operation Manual

System ("POMS") DI 24583.005(A). Here, Dr. Wewerka examined the Listing of Impairment's

"Paragraph B" criteria for mental impairments at the initial level of review. (AR at 209-10). She

determined that Plaintiff had mild limitations in understanding, remembering, and applying

information, in interacting with others, and in adapting or managing oneself. (*Id*. at 209). In

contrast, she found ***moderate*** limitations in Plaintiff's ability to concentrate, persist, or maintain

pace. (*Id*.).

At step four of the sequential evaluation process, state agency consultants use another

eCAT form, the Mental Residual Functional Capacity Assessment ("MRFCA"), to assess the

claimant's mental RFC. *See Young v. Berryhill*, No. CIV 16-1024 GJF, 2018 WL 840022, at *14

n.11 (D.N.M. Feb. 13, 2018); POMS DI 24510.060(A)(1). While the "PRT has overall ratings

for various categories, including maintaining concentration, persistence, or pace, the MRFCA

has more focused categories for use in determining RFC." *Lull v. Colvin*, 535 F. App'x 683, 686 (10th Cir. 2013). The MFRCA form requires the consultant to "first record preliminary conclusions about the effect of the impairment(s) on each of four general areas of mental function" in Section I.[1] *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1159 (D.N.M. Aug. 25, 2016) (quoting POMS DI 24510.061(A)). Next, the consultant "prepare[s] a narrative statement of mental RFC" in Section III. *Id.* at 1159-60. If a consultant determines that a claimant has moderate limitations in an area of functioning, she must describe the "degree and extent of the capacity or limitation" in "narrative format" in Section III of the MRFCA. *Id*. Once a disability claim reaches the ALJ stage, the "MRFCA form is no longer the adjudication of the case; rather it becomes evidence that the ALJ must consider in making her own new, independent findings." *Id*. All findings from the MRFCA form are considered by the ALJ and, generally speaking, "[t]he distinction between Section I and Section III, which was meaningful for the physician adjudicator, has little to no bearing on how the ALJ must weigh the MRFCA report." *Carrillo*, 2020 WL 6136160 at \*6 (quoting *Silva*, 203 F. Supp. 3d at 1159-60).

Here, at Section I of her MRFC, Dr. Wewerka found Plaintiff ***moderately*** limited in the following areas: understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for extended periods, interacting appropriately with the general public, and responding appropriately to changes in the work setting. (AR at 213-14). Nevertheless, at Section III she ultimately concluded that Plaintiff retained the capacity to

---

[1] Previously, state agency consultants completed special form SSA-4734-F4-SUP, which was formally divided into Section I ("Summary Conclusions" containing checkboxes) and Section III ("Functional Capacity Assessment"). *Vienna v. Saul*, No. 2:18-CV-00783-LF, 2019 WL 4686718, at \*4 n.8 (D.N.M. Sept. 26, 2019). Although MRFCAs completed through eCAT no longer include the same section labels, "parties and the courts have continued to refer to the checkbox portion of each MRFCA as 'Section I,' and the 'narrative' portion(s) as 'Section III.'" *Id*. Moreover, POMS DI 24510.060–65 instructions on completion of SSA-4734-F4-SUP apply equally to the eCAT version of the form. *Id*.

"understand, remember and carry out detailed, but not complex instructions, make decisions, concentrate and pay attention for two hours at a time, interact adequately with co-workers and supervisors and respond appropriately to changes in a work setting."[2] (*Id*. at 214). She offered the caveat that this RFC assumed Plaintiff "maintained abstinence and [treatment] compliance." (*Id*.). Based upon the information in the record, the Court can infer that Dr. Wewerka was referring to Plaintiff's abstention from the use of methamphetamine. (*See, e.g*., *id*. at 453). Dr. Wewerka explicitly rejected Plaintiff's allegations of more severe, disabling mental impairments, opining that the "[a]lleged severity" in Plaintiff's Function Reports was not supported by the record.[3] (*Id*. at 210). In general, those reports describe severe limitations in the areas of concentration, social functioning, and adapting to changes in routine. (*See, e.g*., *id*. at 354-55, 364-66). Significantly, when Plaintiff's disability claim reached the ALJ-stage, the ALJ determined that Dr. Wewerka's findings were only "partially persuasive." (*Id*. at 238).

### i. Persuasiveness Analysis

Plaintiff argues that that the ALJ failed to give good reasons for her treatment of Dr. Wewerka's findings that are sufficiently specific to allow for meaningful review. (Doc. 17 at 7-11). Accordingly, the Court examines those findings, particularly as they relate to the two requisite factors under 20 C.F.R. § 416.920c. First, the consistency factor calls for a comparison

---

[2] Elsewhere, Dr. Wewerka explained that Plaintiff "appears to retain the abilities for semi-skilled work." (AR at 210).

[3] In her Function Reports, Plaintiff reported difficulty concentrating, having to read written instructions multiple times, and forgetting oral instructions. (*See, e.g*., AR at 354, 365). She estimated that she must read text five to six times in order to understand what she is reading. (*Id*. at 364). She indicated that she does not finish what she starts and does not handle stress or changes in routine well. (*Id*. at 354-55). According to Plaintiff, stress makes her anxious, fidgety, and scatterbrained. (*Id*. at 366). She reported that changes in routine confuse her, causing her to be "thrown off." (*Id*.). She disclosed that she is easily irritated, has anxiety in social situations, and experiences difficulty getting along with others. (*Id*. 354, 365).

between the prior administrative findings and "the evidence from other medical sources and nonmedical sources" in the record. 20 C.F.R. § 416.920c(c)(2). The more consistent the findings are with the other evidence, the more persuasive. *Id*. Plaintiff submits that "[b]ased on the ALJ's discussion of Dr. Wewerka's findings, it is clear that she found the moderate limitations that were indicated to be consistent with the record." (Doc. 17 at 7 (citing AR at 238)). Indeed, Plaintiff maintains that "[t]he ALJ herself cited to a total of 24 pages from the record as evidence supporting Dr. Wewerka's assessed moderate limitations." (*Id*. at 8.) A close examination of the ALJ's analysis, however, suggests that Plaintiff's characterization of the ALJ's findings is not entirely accurate.

The ALJ *did* explicitly find that Dr. Wewerka's moderate limitation in the area of concentration was "consistent with [Plaintiff's] observed distractibility where she continued to play a gambling game on her phone during an examination." (AR at 238 (citing AR at 615)). But the ALJ's subsequent finding was that "further restrictions," presumably restrictions beyond those determined by Dr. Wewerka, were warranted. (*See id*.). Specifically, the ALJ found Plaintiff capable of performing only simple, routine tasks, having only occasional interactions with the public, coworkers, and supervisors, and performing work only in the same location every day. (*Id*.). This finding stands in contrast to Dr. Wewerka's Section III RFC finding that Plaintiff was capable of understanding, remembering, and carrying out ***detailed*** instructions, working "***adequately***" with coworkers and supervisors, and responding "***appropriately***" to changes in a work setting. (*See* AR at 214 (emphasis added)). In short, the ALJ's mental RFC provided a greater level of restriction than the RFC contained in Dr. Wewerka's Section III narrative explanation.

In support of her own, more restrictive RFC, the ALJ referenced numerous treatment records, which described irritability, depressed and anxious mood, constricted affect, and pressured speech. (*Id*. at 238 (citing AR at 450-51, 453-55, 563-64, 568-69, 571-75, 578, 593, 600-01, 610, 615, 622-23, 626, 702-03, 820)). Contrary to Plaintiff's characterization of the ALJ's rationale, the Court reads the ALJ's persuasiveness analysis to say that she found ***her own RFC***, not Dr. Wewerka's RFC, to be wholly consistent with evidence from other sources. Indeed, the ALJ at least intimated that Dr. Wewerka's RFC did not suffice to account for Plaintiff's mental impairments. In short, the ALJ found only a portion of Dr. Wewerka's prior administrative findings – her moderate limitations in concentration – consistent with evidence from other sources.

For purposes of the supportability factor, the ALJ was charged with examining how well Dr. Wewerka supported her own opinions with "objective medical evidence" and "supporting explanations." *See* 20 C.F.R. § 416.920c(c)(1). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support . . . her . . . prior administrative medical finding(s), the more persuasive [they] will be." 20 C.F.R. §416.920c(c)(1). The ALJ concluded that Dr. Wewerka "did not provide adequate support for [her] opinion[,] as [s]he included minimal citations to the medical record." (AR at 238).

In her MRFCA form, Dr. Wewerka referenced only three medical records, from the spring and early summer of 2019, to support her findings. (*See id*. at 210). According to the first record Dr. Wewerka cited, Plaintiff was seen by psychologist Dr. Paul G. Wilson on June 11, 2019, for a follow-up evaluation. (*See id*.). Dr. Wewerka observed that at that visit Plaintiff's mental status examination ("MSE") findings were normal, except that her mood was anxious and depressed. (*Id*.); (*see also* AR at 450-51). Dr. Wewerka also highlighted Dr. Wilson's mental

impairment diagnoses of Bipolar II Disorder, PTSD, ADHD, and panic disorder. (AR at 210); (*see also* AR at 450). Next, Dr. Wewerka briefly discussed Dr. Wilson's treatment record from a week earlier, June 4, 2019. (AR at 210). She recounted Dr. Wilson's outline of Plaintiff's history, which included methamphetamine use, legal issues, and release from prison three months earlier. (*Id*.); (*see also* AR at 453). Again, Dr. Wewerka highlighted Dr. Wilson's normal MSE findings but acknowledged her anxious and depressed mood. (AR at 210); (*see also* AR at 455). Finally, Dr. Wewerka mentioned an April 16, 2019 medical visit to "re-establish care." (AR at 210). Dr. Wewerka appears to have been referring to a treatment record from Dr. Gary John Coomber's "first encounter" with Plaintiff on that date, following a three-year period during which Plaintiff did not see a primary care physician due to incarceration. (*See* AR at 461). Dr. Wewerka observed that Dr. Coomber diagnosed Bipolar II disorder but described Plaintiff's mood and affect as "normal" on that date. (*Id*. at 210); (*see also* AR at 462 (reporting that "[a]t present, she does not appear acutely depressed, nor manic, nor irritable or agitated"); 463 (assessing Bipolar II disorder)).

On the whole, the records referenced by the Dr. Wewerka suggest that Plaintiff was diagnosed with mental impairments and that on at least two occasions she had an anxious and depressed mood and affect, but her MSE findings were otherwise normal. Even so, Plaintiff asserts that the ALJ's finding that Dr. Wewerka did not adequately support her findings is unclear and illogical. (Doc. 17 at 8). She reasons that "[w]hile it may be true that Dr. Wewerka 'included minimal citations to the medical record,' it is not clear why this should diminish the opinion's persuasiveness, given that the ALJ was plainly able to find support existed in at least 24 places in the record." (*Id*. (citing AR at 238)). Plaintiff maintains that it was error for the ALJ to discount the persuasiveness of Dr. Wewerka's opinion based upon a failure to "identify every

record that supported her opinion." (*Id*.). She acknowledges that supportability and consistency are "two distinct factors" that must be considered under the applicable regulation, but she suggests that in this case "consistency with the record is the more relevant factor." (*Id*.). The Court disagrees, both with Plaintiff's conclusion and with her underlying premise.

As noted above, the ALJ offered a string of record citations to demonstrate the consistency of ***her own RFC***, not the findings of Dr. Wewerka. Moreover, the ALJ was required, under 20 C.F.R. § 416.920c(b)(2), to consider and discuss ***both*** the consistency and supportability factors, which she did. The ALJ properly found Dr. Wewerka's moderate concentration limitation consistent with record evidence but emphasized that Dr. Wewerka supported her own findings with only "minimal citations to the medical record." (AR at 238). Again, Dr. Wewerka referenced and *briefly* discussed only three records, which generally indicated normal MSE findings, save two notations to anxious and depressed mood and affect. (*See* AR at 210). Dr. Wewerka did not expand upon the relevance of the records she cited, nor did she otherwise offer supporting explanations. (*See id*.). Under the circumstances, the Court can follow the ALJ's reasoning and is satisfied that her supportability finding was supported by substantial evidence.

In sum, Plaintiff essentially asks the Court to reweigh the applicable factors under 20 C.F.R. § 416.920c, affording more weight to the consistency factor than the supportability factor, but she offers no authority to suggest that this would be proper. The Court will deny Plaintiff's motion on this ground.

## ii. Incorporation of Moderate Limitations into RFC

Plaintiff alleges a second error in the ALJ's treatment of Dr. Wewerka's findings – that she failed to specify which of Dr. Wewerka's findings she rejected and which she accepted.

(Doc. 17 at 8). Relatedly, she submits that the ALJ failed to explain why she did not incorporate the "limitations at issue." (*Id*. at 9). Based upon the Court's reading of Plaintiff's briefs, her principal complaint appears to be that the ALJ did not incorporate more restrictive limitations to account for moderate limitations in concentration and in adapting to workplace changes. (*See id*. at 10).

### a. Concentration Limitation

Plaintiff alleges that the ALJ failed to explain the rejection of Dr. Wewerka's moderate limitation in her "ability to maintain attention and concentration for extended periods." (*Id*. at 8-9 (citing AR at 213-14)). Underlying this contention is a more fundamental assertion – that the ALJ's RFC determination does not in fact account for the moderate limitation that Dr. Wewerka assessed in this area. (*See id.* at 8-11). Notably, the Commissioner insists that the ALJ's RFC ***does*** properly account for a moderate limitation in this area of functioning and, further, that the ALJ adequately explained her treatment of Dr. Wewerka's findings. (Doc. 21 at 4-6).

To be sure, the ALJ characterized Dr. Wewerka's moderate limitation in concentration as "consistent" with the record and noted, just as Dr. Wewerka had done before her, that Plaintiff's primary care physician observed her playing a game on her phone during a medical examination. (AR at 234, 238 (citing AR at 615)). Likewise, in her own examination of the "Paragraph B" categories of functioning at step three, the ALJ likewise determined that Plaintiff had moderate limitations in concentration, persistence or maintaining pace. (*Id*. at 235). In support of this finding, she observed that Plaintiff complained of difficulty concentrating and, again, that her primary care physician had observed distractibility. (*Id*. (citing AR at 615)). At the same time, though, the ALJ acknowledged that the record revealed intact attention, concentration, and normal psychomotor activity. (AR at 235 (citing AR at 450-51, 454-455, 564, 569, 571, 573,

575, 578, 600-01, 610, 615, 623, 703, 820)). She rejected marked limitations in this area of functioning, explaining that the testimony and record suggested that Plaintiff's activities of daily living were inconsistent with a marked limitation in concentration, persistence, and pace. (*Id*. at 234).

In her RFC assessment, the ALJ once again acknowledged that Plaintiff alleged difficulty concentrating, completing tasks, following instructions, understanding, and remembering. (*Id*. at 237). However, she determined that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the record. (*Id*). She highlighted Plaintiff's treatment, through prescription medications and visits with a behaviorist, and noted that she generally showed "benign signs" but also that she occasionally demonstrated depressed and anxious mood, constricted affect, pressured speech, agitation, and distractibility. (*Id*. at 238 (citing AR at 450-51, 454-455, 564, 569, 571, 573, 575, 578, 600-01, 610, 615, 623, 703, 820)). The ALJ summarized her view of the record: "Plaintiff . . . has a history of mental impairments; however, the medical evidence is equally inconsistent with the alleged mental . . . limitations." (*Id*.). In other words, the record confirmed mental impairment diagnoses and symptoms but was not fully supportive of Plaintiff's allegedly disabling mental limitations. Nevertheless, the ALJ ultimately assessed a mental RFC that limited Plaintiff to simple, routine tasks, simple work decisions, and work not at a production pace. (*Id*. at 236).

Plaintiff submits that the ALJ's mental RFC did not adequately incorporate Dr. Wewerka's moderate limitation in concentration, asserting that "it has been repeatedly held that a limitation to unskilled work is not a sufficient incorporation of findings that an individual has moderate mental limitations." (Doc. 17 at 10 (citing *Gabaldon v. Berryhill*, Civ. No. 16-769 CG, 2017 WL 3530382 (D.N.M. Aug. 16, 2017); *Jaramillo v. Colvin*, 576 F. App'x 870, 876 (10th

Cir. 2014); *Pitts v. Kijakazi*, Civ. No. 20-0125 CG, 2021 WL 5049441 (D.N.M. Nov. 1, 2021)). A close reading of the cases upon which Plaintiff relies, however, reveals that they are not directly on point.

In *Gabaldon*, for instance, The Honorable Carmen Garza of this District reasoned that "[w]ithout analysis from the ALJ or the VE, [it could not] say that limiting Ms. Gabaldon to unskilled work would accommodate her ***marked*** limitation in being able to interact with the general public." 2017 WL 3530382, at *3 (emphasis added). In contrast, the ALJ here provided analysis concerning Plaintiff's mental limitations and, further, did not adopt any *marked* limitations. In *Jaramillo*, the ALJ "concurred in" the state agency psychological consultants' findings, including the consultant's Section III narrative conclusion that the plaintiff could concentrate for two-hour periods,[4] which the Tenth Circuit found consistent with a limitation to unskilled work. *Jaramillo*, 576 F. App'x at 875-76. As for whether the state agency consultant's Section III narrative contradicted moderate limitations he found in Section I, the court declined to reach the issue, finding it had been forfeited. *Id*. Finally, in contrast to the ALJ here, the ALJ in *Pitts* found the moderate mental limitations *and* the RFCs of two state agency psychological consultants' "persuasive."[5] *See Pitts* 2021 WL 5049441 at *3. According to Judge Garza of this District, the state agency consultants there failed to explain how the claimant's moderate limitations in maintaining attention and concentration for extended periods affected their RFCs. *Id*. at *6. Finding that the consultant's "Section III narratives [did] not encapsulate these

---

[4] Like Dr. Wewerka, the state agency psychological consultant in *Jaramillo* found the plaintiff moderately limited in his ability to concentrate for *extended* periods at Step I of the MRFC form but later found the plaintiff capable of attending and concentrating for two hours at a time in his Step III narrative. *See Jaramillo*, 576 F. App'x at 872-73.

[5] In *Pitts*, the state agency psychological consultants determined that the plaintiff was limited to unskilled work with reduced social interactions. 2021 WL 5049441 at *3.

limitations," she held that the ALJ "erred in relying on their opinions as substantial evidence." *Id*. She summarized: "[W]here an ALJ relies on a Section III narrative opinion for his RFC finding, but the narrative opinion 'fails to describe the effect that each of the Section I moderate limitations would have on the claimant's ability, or if it contradicts limitations marked in Section I, the [opinion] cannot properly be considered part of the substantial evidence supporting an ALJ's RFC finding." *Id*. (quoting *Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015)). While this Court generally agrees with the rationale articulated in *Pitts*, Plaintiff's claim is distinguishable. Most notably, the ALJ here *rejected* the limitations in Dr. Wewerka's Section III narrative in favor of her own more restrictive RFC.[6]

Although the cases cited by Plaintiff do not resolve the issue before the Court, the ALJs RFC must still incorporate the moderate limitations she accepts, which in this case includes a moderate limitation in Plaintiff's ability to maintain concentration for extended periods. (*See* AR at 234, 238). Plaintiff insists that it does not incorporate such a limitation. (Doc. 17 at 9-11). The Commissioner, on the other hand, insists that it does. (Doc. 21 at 5-6). Surprisingly, the question confronting the Court – whether a limitation to simple, routine tasks and simple work decisions with no fast-paced production work accommodates a moderate limitation in maintaining attention and concentration for extended periods – does not have an entirely straightforward answer. The parties' contrasting views of the laws are no doubt a product of confusing, sometimes conflicting, analyses offered by courts on this and similar issues.

---

[6] Along these same lines, Plaintiff cites *Garcia v. Saul*, No. 20-00097 KBM (D.N.M. Apr. 14, 2021) in her reply brief for the proposition that an ALJ errs "by relying only on [an] incomplete [Section III] narrative" that does not account for moderate limitations found in Section I of an MRFCA. (Doc. 23 at 3). But it is inaccurate to suggest that the ALJ here relied upon an incomplete narrative. Although she accepted Dr. Wewerka's finding that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, she rejected Dr. Wewerka's Section III findings and RFC, opting for a more restrictive RFC.

The Tenth Circuit's 2015 decision in *Vigil v. Colvin* offers the most logical starting point for an inquiry into the incorporation of moderate concentration limitations into an RFC. In *Vigil*, the Tenth Circuit explained that "a moderate limitation in concentration, persistence, or pace at step three does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment." *Vigil v. Colvin*, 805 F.3d 1199, 1203 (10th Cir. 2015). The Tenth Circuit noted that at the "'more detailed' step four assessment" the ALJ found that the claimant had difficulties with concentration, persistence, and pace such that he could not perform complex tasks. *Id*. Nevertheless, the ALJ reasoned that the claimant retained sufficient memory and concentration to perform simple tasks. *Id.* at 1203-04. Ultimately, the court was satisfied that the ALJ accounted for the claimant's moderate limitations in concentration, persistence, and pace by limiting him to unskilled work. *Id.* at 1204. The court noted that "[u]nskilled work generally requires only the following: (1) '[u]nderstanding, remembering and carrying out simple instructions'; (2) '[m]aking judgments that are commensurate with the functions of unskilled work – i.e., simple work-related decisions'; (3) '[r]esponding appropriately to supervision, co-workers and usual work situations'; and (4) '[d]ealing with changes in a routine work setting.'" *Id*. (quoting SSR 96-9p, 1996 WL 374185, at *9 (July 2, 1996)).

A year later, the Tenth Circuit ratified its holding in *Vigil* and explained that an ALJ "can account for moderate limitations by limiting the claimant to particular kinds of work activity." *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016) (citing *Vigil*, 805 F.3d at 1204). In *Smith*, the Tenth Circuit considered whether an ALJ's RFC incorporated nine moderate limitations found by a non-examining source, including, among others, a moderate limitation in the area of maintaining concentration, persistence, and pace. *Id*. The medical source provided an RFC narrative that omitted any mention of the majority of those moderate limitations and

recommended that the claimant could perform "work that was limited in complexity." *Id*. The

ALJ adopted the RFC recommendation and found that the claimant could perform "simple,

repetitive, and routine tasks." *Id*. The Tenth Circuit indicated that it was satisfied that the ALJ

had "incorporated the functional limitations of [the claimant's] moderate nonexertional

limitations[,]" including a moderate limitation in concentration, persistence, or pace. *Id*. The

court explained that its "function is not to compare the ALJ's findings to a physician's "notations

of moderate findings," but to compare the ALJ's findings to the physician's opinion. *Id*.

Following *Smith*, Tenth Circuit rationale has diverged to some extent as the court

grapples with the distinction between and the import of MRFCA's Section I limitations and

Section III narratives. In *Carver v. Colvin*, for instance, the Tenth Circuit held that where an ALJ

relies on a Section III narrative opinion for his RFC finding, but the narrative opinion "fails to

describe the effect that each of the Section I moderate limitations would have on the claimant's

ability, or if it contradicts limitations marked in Section I, the [opinion] cannot properly be

considered part of the substantial evidence supporting an ALJ's RFC finding." 600 F. App'x at

919. But as recently as 2021, the Tenth Circuit, in *Fannin v. Comm'r, SSA*, 857 F. App'x 445

(10th Cir. 2021), seized upon the explanation articulated in *Smith* to describe Section I of the

MRFCA as "merely a worksheet to aid in deciding the presence and degree of functional

limitations and the adequacy of documentation [that] does not constitute the RFC assessment."

*Fannin*, 857 F. App'x 447 (quoting POMS DI 24510.060). The *Fannin* court concluded that

challenges to an ALJ's RFC assessment there, based upon its incorporation of limitations in

Section I of an MRFCA, "ask 'the wrong question.'" *Id*. (citing *Smith*, 821 F.3d at 1269 n.2). Not

surprisingly, the post-*Smith* cases in this District have not always resolved the issue in a

consistent manner. *Compare, e.g., Silva v. Colvin*, 203 F. Supp. 3d 1153 (D.N.M. 2016) (holding

that an ALJ must account for both Section I and Section III limitations in RFC analysis), *with Rush v. Saul*, 389 F. Supp. 3d 957, 969 (D.N.M. 2019) (holding that, under *Smith*, the ALJ need only account for the limitations found in Section III).

The Commissioner, for her part, relies upon the Tenth Circuit's reasoning in *Vigil* as well as a more recent case from this District, *Padilla v. Berryhill*, No. CIV 17-329 GJF, 2018 WL 3830930 (D.N.M. Aug. 13, 2018). Of the cases referenced by the parties, *Padilla* is the most analogous. There, the state agency psychological consultant, the same Dr. Wewerka as in this case, found the plaintiff moderately limited in his ability to maintain attention and concentration for extended periods. *Id*. at *14. The Honorable Gregory J. Fouratt of this District ultimately held that by limiting the plaintiff to simple work tasks and simple decisions, not at a production pace, the ALJ's RFC took into account the moderate limitations in sustaining concentration. *Id*. at *13 (citing *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012)).

Although the issue of whether and how an RFC assessment must incorporate Section I limitations is not entirely resolved in this Circuit, the Court concludes that, as a general proposition, a limitation to unskilled work does not ***necessarily*** account for all of a claimant's mental limitations. At the same time, it is also satisfied that a limitation to simple, routine work at a non-production pace may, in some instances, adequately account for moderate limitations in concentration. *See, e.g*., *Padilla*, 2018 WL 3830930 at *13.

Notably, here, the ALJ did not turn a blind eye to Dr. Wewerka's Section I moderate concentration limitation. Instead, she explicitly acknowledged the limitation and characterized it as consistent with the evidence. (AR at 234). Further, she found a similar limitation in her own analysis of functioning at step three of her sequential evaluation process. (*Id*. at 213-14). Acknowledging that Plaintiff "regularly displayed intact attention and concentration," (*id*. at 235

(citing AR at 450-51, 454-55, 564, 569, 571, 573, 575, 578, 600-01, 610, 618, 623, 703, 820)),

she nevertheless concluded that her concentration limitation caused more than minimal

limitations in Plaintiff's ability to perform basic mental work activities (*see id*. at 238). Notably,

the ALJ's expressed rationale suggests that she formulated a more restrictive RFC than Dr.

Wewerka, at least in part, to account for Plaintiff's moderate concentration limitation. (*See id*.).

Although she could have perhaps been more direct in her analysis, the Court infers that

additional restrictions – to simple, routine tasks with simple work decisions and non-production

pace – were aimed at incorporating a moderate concentration limitation. (*See id*.). Plaintiff does

not cite to any on-point authority to convince the Court that the ALJ failed to adequately account

for Dr. Wewerka's moderate concentration finding.[7] As such, the Court concludes that the ALJ

did not reject Dr. Wewerka's moderate concentration limitation, that she incorporated such a

finding into her RFC, and that she adequately explained how she did so. The Court will not

reverse on this ground.

**b.  Limitation in Responding to Workplace Changes**

Next, Plaintiff contends that the ALJ failed to adequately address Dr. Wewerka's

moderate limitation in her ability to respond appropriately to changes in the work setting. (Doc.

17 at 11). In her PRT, Dr. Wewerka rated Plaintiff's limitation in her ability to adapt and manage

herself as "mild." (AR at 209). However, at Section I of the MRFCA, she found Plaintiff

***moderately*** limited in her ability to respond appropriately to changes in the work setting. (*Id*. at

---

[7] Plaintiff also asserts that a "full inclusion" of Dr. Wewerka's moderate mental limitations would have precluded competitive work, as an individual whose mental impairments causes them to remain off task for 30 percent of the day cannot maintain employment. (Doc. 17 at 11-12). However, Plaintiff does not point to a medical opinion that limited her to work permitting her to be off task for 30 percent of the time. Notably, such a limitation does not appear to originate from Dr. Wewerka's opinion. In any event, the Court disagrees with any suggestion that a 30-percent-off-task limitation was necessary to address a moderate limitation in concentration.

214.) Confusingly, at Section III, she concluded that Plaintiff *could* respond appropriately to changes in the work setting. (*Id*.). Dr. Wewerka's findings in this regard were arguably inconsistent.

The ALJ did not mention Dr. Wewerka's Section I moderate limitation in this area of functioning. (*See* AR at 230-41). She did, however, determine at step three of her own sequential evaluation process that Plaintiff was moderately limited in her ability to adapt and manage herself. (*Id*. at 235). The ALJ reasoning was simple: Plaintiff's "symptoms can be expected to affect her ability to adapt or manage herself." (*Id*.). In terms of symptoms, the ALJ recounted Plaintiff's complaints that she experiences anxiety and panic attacks, particularly when she is around multiple people. (*Id*. at 237). She noted that Plaintiff reportedly has difficulty "talking, hearing, seeing, remembering, completing [t]asks, concentrating, understanding, following instructions, [and] getting along with others." (*Id*.). In contrast, she also explained that Plaintiff's "examining sources did not observe any associated abnormal signs," and Plaintiff "regularly displayed alertness, orientation, logical and coherent thought process and normal thought content." (AR at 235 (citing AR at 450-51, 454-455, 564, 569, 571, 573, 575, 578, 600-01, 610, 615, 623, 703, 820)). Ultimately, the ALJ assessed an RFC that limited Plaintiff to work performed "in the same location every day." (*Id*. at 236).

Plaintiff submits that such a limitation does not fully account for Dr. Wewerka's moderate limitation in this area of functioning. (Doc. 17 at 11). She posits that there could be "changes related to other aspects of either the work environment or the work itself," though she fails to enumerate alternative limitations that might be more suited to her abilities. (*Id*.). Plaintiff goes on, citing the POMS DI 25020.010(B)(3) – Mental Abilities Critical for Performing Unskilled Work, which refer to the ability to "respond appropriately to changes in a (routine)

work setting." (*Id*.). She seizes upon the POMS's use of the word "work setting," rather than "work settings" and submits that because "[t]he word 'setting' is not plural[,] . . . the ALJ's limitation to working at the same location every day is no limitation at all." (*Id*.). Plaintiff's arguments strike the Court as speculative and somewhat far-fetched. More importantly, they are not supported by any on-point authority.

Even though the ALJ did not specifically discuss Dr. Wewerka's Section I moderate limitation in her ability to respond appropriately to changes in the work setting, the Court is satisfied that her RFC restriction to work in the same location every day reasonably accounted for such a limitation. More generally, while the ALJ could have perhaps been more explicit in her consideration of Dr. Wewerka's prior administrative findings, the Court can infer that she rejected those findings to the extent that they did not match her own, more restrictive RFC. That is, the ALJ effectively rejected Dr. Wewerka's findings that Plaintiff could understand, remember, and carry out detailed instructions, that she could tolerate more than occasional interactions with coworkers and supervisors, and that she could respond ***appropriately*** to changes in the work setting. The Court finds no harmful error related to Plaintiff's treatment of Dr. Wewerka's Section I moderate limitation finding in the area of adapting to changes in the work setting, or as to any of her moderate limitation findings, and will therefore deny Plaintiff's motion on this claim.

## B.  Evaluation of Plaintiff's Subjective Complaints

Plaintiff contends that "[t]he ALJ's RFC is not based on substantial evidence because she failed to account for [Plaintiff's] subjective allegations of pain and other symptoms, contrary to SSR 96-8p, SSR 16-3p, and case law." (Doc. 17 at 12). Specifically, she submits that if the ALJ had "properly credited [her] complaints of migraine headaches and chronic knee pain based upon

the objective and subjective medical evidence, the RFC would have been more restrictive, precluding competitive work." (*Id*. at 18.) The Commissioner, in contrast, maintains that the ALJ adequately addressed Plaintiff's subjective complaints and reasonably concluded that additional restrictions to account for Plaintiff's migraine headaches and knee pain were unwarranted. (Doc. 21 at 7).

### i.  Migraine Headaches

"At step two, an ALJ must consider whether an impairment is severe." *Lopez v. Berryhill*, No. CV 16-552 SCY, 2017 WL 4356284, at *3 (D.N.M. Sept. 30, 2017) (citing *Smith*, 821 F.3d at 1266 (citing 20 C.F.R. § 416.920(a)(4)(ii))). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). Here, the ALJ determined that Plaintiff's migraine headaches were a medically-determinable but non-severe impairment. (AR at 232). When an ALJ determines that an impairment is non-severe, as here, she must still "consider [that impairment] when formulating her RFC, if warranted by the record." *Lopez v. Berryhill*, No. CV 16-0638 KBM, 2017 WL 2799293, at *5 (D.N.M. May 31, 2017). Here, the ALJ at least purported to consider all of Plaintiff's medically-determinable impairments in determining Plaintiff's RFC. (*See* AR at 233). Yet, she did not specifically mention Plaintiff's migraine headaches at any subsequent step of her decision beyond step two. (*See* AR at 233-41). Because the ALJ's only analysis of Plaintiff's migraine headaches was at step two, the Court begins there.

In support of her step-two determination that Plaintiff's migraine headaches were non-severe, the ALJ explained that Plaintiff "testified that her migraine headaches are milder with Ibuprofen and Topamax." (AR at 233 (citing AR at 460) (June 4, 2019 list of outpatient

medications, including Ibuprofen and Topamax)). The ALJ indicated that the evidence did not demonstrate that Plaintiff's migraine headaches resulted in any work-related limitations. (*Id*.).

The Commissioner emphasizes that in her application for disability benefits Plaintiff did not identify migraine headaches as a condition that limited her ability to work. (Doc. 21 at 7 (citing AR at 339)). Moreover, she observes that when asked at the administrative hearing to describe the conditions that prevented her from working, Plaintiff initially neglected to mention migraine headaches. (*Id*. (citing AR at 31-32)). While these observations are both true, the administrative hearing was not devoid of discussion of Plaintiff's migraine headaches. Indeed, Plaintiff's representative indicated at the outset of the administrative hearing that migraine headaches limited Plaintiff's ability to work. (*Id*. at 31). Then, after Plaintiff provided some initial testimony concerning other impairments, the ALJ quickly turned to her migraines, noting that the record suggested she was taking medication to address migraine headaches. (*Id*. at 36). Plaintiff testified that she sometimes takes 800 milligrams of Ibuprofen at night and 400 milligrams of Ibuprofen during the day to treat her migraine headaches. (*Id*.). The ALJ circled back to Plaintiff's migraines, inquiring about additional medications that Plaintiff used to prevent and treat migraines. (*Id*. at 39). Plaintiff testified that she took Topamax daily as migraine prevention and Sumatriptan when she senses a migraine coming on. (*Id*. at 39-40). When the ALJ asked Plaintiff how often she takes Sumatriptan, Plaintiff responded, "It's almost every day. I wake up with a migraine. Sometimes it wakes me up out of my sleep . . . ." (*Id*. at 40). Plaintiff testified that the Sumatriptan makes her migraine headache "milder." (*Id*.). She clarified that "[i]t doesn't take it completely away but it milds it a lot[,]" allowing her to open her eyes. (*Id*.). Plaintiff explained that her physician had been discussing with her the possibility of monthly

injections, though she indicated that her insurance "isn't approving it unless [she does] Botox." (*Id*. at 41).

In her motion to remand, Plaintiff points to treatment records from August, September, and October 2020 to support her position that the ALJ failed to adequately consider the work-related impact of her migraine headaches. (Doc. 17 at 14-15). The first record was from Plaintiff's August 11, 2020 telephonic visit with Presbyterian Medical Center, during which her chief complaint was "migraines." (AR at 822). At that visit, Plaintiff described her migraine headaches as intermittent, recurrent, and gradually worsening. (*Id*.). She rated her pain as 7 out of 10 and described it as squeezing, shooting, and throbbing. (*Id*.). She reported associated symptoms of "dizziness, photophobia, sinus pressure and tingling." (*Id*.). CNP Jamie Sandoval assessed an "[i]ntractable migraine with aura with status migrainosus" and noted that Plaintiff reported getting more than four migraines per week. (*Id*. at 829). CNP Sandoval provided an ambulatory referral to neurology. (*Id*.).

The second record, from a month later, reveals an assessment of "chronic migraines, 16 times a month, with migrainous features." (*Id*. at 835). At that visit Plaintiff reported "some benefit with topiramate but headache frequency . . . still high." (*Id*.). MA Agnel M. Luna advised that Plaintiff's "best option" was Botox injections, which Plaintiff indicated she would consider. (*Id*. at 835-36). MA Luna also noted that Plaintiff had not tried Sumatriptan or Imitrex for treatment of her migraines and indicated that he "need[ed] to rule out that she has cardiac or ischemic cardiomyopathy, which would contraindicate the use of triptans." (*Id*. at 835).

Plaintiff also briefly references a treatment record from October 2020. (*See* Doc. 17 at 15) (noting that Plaintiff "later expressed" that she was afraid to get Botox injections). At that visit, Alfred Van Baak, M.D. once again assessed "chronic migraines, 16 times a month, with

migrainous features." (AR at 847). Because Plaintiff was "scared of getting injections on her

head or on her face," Dr. Baak indicated that Aimovig would be the "next option." (*Id*.).

Significantly, he also asked Plaintiff to try Sumatriptan or Imitrex to treat her migraines. (*Id*.).

The Commissioner submits that these three records from the fall of 2020 are the only

ones that document complaints regarding Plaintiff's migraine headaches. (Doc. 21 at 7). Plaintiff

does not point to any additional records to suggest otherwise. (*See* Doc. 23 at 5-6). As noted

above, Plaintiff's testimony at the administrative hearing indicates that following her October

2020 visit with Dr. Baak, Plaintiff found relief from her migraines by using Sumatriptan, which

"milds" her migraine headaches "a lot." (AR at 40). Significantly, it was this testimony upon

which the ALJ relied in reaching in her step-two severity determination. (*See id*. at 233 (citing

AR at 460)). As such, the Commissioner maintains that on this "limited record" it was

reasonable for the ALJ to conclude that Plaintiff's migraines did not result in work-related

limitations. (Doc. 21 at 8 (citing *Evans-Guillen v. Berryhill*, No. 16-cv-327-GJF, 2017 WL

1491894, at *9 (D.N.M. Apr. 12, 2017)).

Plaintiff, in contrast, submits that the "the ALJ erred legally by simply reciting some of

[her] subjective complaints and some of the objective evidence but failing to provide any

analysis linking the two." (Doc. 23 at 5 (citing Doc. 17 at 17)). Relying upon this Court's

decision in *Fernandez v. Saul*, Civ. No. 1:18-CV-00633-KRS, 2019 WL 4565195 (D.N.M. Sept.

20, 2019), Plaintiff contends that it is "not clear whether the RFC is based on substantial

evidence because the ALJ did not properly conduct a subjective-allegations analysis." (Doc. 17

at 17). There, this Court determined that the ALJ failed to adhere to the applicable regulations in

evaluating the claimant's pain and related limitations. *Fernandez*, 2019 WL 4565195, at *3. The

ALJ in *Fernandez* "us[ed] only those 'portions of evidence favorable to his position,' while

excluding significantly probative evidence without explanation." *Id*. (quotation and citation omitted). Moreover, he erroneously referenced normal examination findings "without any link to [the claimant's] symptoms or explanation of their probative value." *Id*. at *4 (citing *Praytor v. Comm'r, SSA*, 750 F. App'x 723, 727 (10th Cir. 2018)).

But this case is distinguishable from *Fernandez*. Plaintiff here has not pointed to significantly probative evidence that the ALJ excluded without explanation. Rather, the records Plaintiff cites from the fall of 2020 document her subjective complaints regarding migraine headaches ***prior to*** her use of sumatriptan, which she testified improved her pain and symptoms "a lot." (AR at 40). Further, Plaintiff has not pointed the Court to evidence that would dictate additional limitations were warranted in the RFC to account for her migraine headaches. The Court can follow the ALJ's reasoning and is satisfied that she followed the applicable regulations and that her findings, as to Plaintiff's migraine headaches, are supported by substantial evidence.

### ii.   Bone-on-Bone Knee Pain

In contrast to Plaintiff's migraine headaches, the ALJ classified Plaintiff's knee osteoarthritis as severe. (AR at 232-36). At step three, however, she explained that Plaintiff's "regular display of normal gait" meant that the impairment did not meet Listing 1.02. (AR at 234 (citing AR at 458, 462, 571, 595, 603, 679, 681, 700, 727, 732, 747, 750, 795, 819-20, 847)). At step four, the ALJ's RFC limited Plaintiff to light work with only occasional stooping, crouching, kneeling, crawling, and climbing ramps and stairs, as well as never climbing ladders, ropes, and scaffolds. (*Id*. at 236). In reaching this RFC, the ALJ explained that the "objective medical evidence establish[ed Plaintiff's] . . . knee osteoarthritis; however, the evidence does not support the severity of [her] alleged limitations." (*Id*. at 237).

In terms of subjective complaints, the ALJ observed that in her Function Reports Plaintiff reported "difficulty walking, standing, sitting, lifting . . . and performing postural movements." (*Id*. (citing AR at 349-59, 360-68, 402-09)). She acknowledged Plaintiff's testimony that she has "burning and pressure on her body" upon standing or sitting for long periods. (*Id*.). She also mentioned Plaintiff's complaints that she needs to frequently change positions between standing and sitting and that her knees and feet swell. (*Id*.). Finally, she acknowledged Plaintiff's reports of elevating her legs while sleeping to combat swelling. (*Id*.).

Turning to the objective medical evidence, the ALJ observed that x-rays from February 20, 2016, showed moderate knee osteoarthritis with more advanced joint space narrowing on the left. (*Id*. (citing AR at 518-20)). She further noted that an "updated x-ray" of Plaintiff's right knee on November 11, 2019, showed "mild tricompartmental degenerative osteoarthritis with fluid in the knee." (*Id*. (citing AR at 618)). The ALJ observed that Plaintiff's right knee pain and weakness, as well as her back and neck pain, was treated with various medications, a low carb diet, trigger point injection, and physical therapy. (*Id*. (citing AR at 450, 567, 603, 615, 618, 739, 811, 870-918)). She noted that Plaintiff's mobility improved with physical therapy. (*Id*. at 238 (citing AR at 857, 893, 897)). The ALJ conceded that there were abnormal signs in the record with respect to Plaintiff's right knee, including tenderness and effusion, but she also emphasized that there were "benign signs," such as normal muscle tone, normal muscle strength, intact sensation, normal coordination, normal range of motion in the musculoskeletal system, . . . and normal gait without assistive device." (*Id*. at 237-38 (citing AR at 458, 462, 466, 571, 595, 603, 617, 620, 626, 679, 681, 687, 691, 694, 697, 700, 703, 727, 732, 735, 738, 741, 744, 747, 750, 753, 795, 819-20, 835, 847)).

In terms of medical opinions, the ALJ rejected the state agency medical consultants'
opinions that Plaintiff could perform work at the medium exertional level on the basis that
"objective evidence . . . [showed] tenderness to the palpitation of . . . [the] right knee, and
effusion of the right knee." (*Id.* at 239 (AR at 458, 462, 466, 571, 595, 603, 617, 620, 626, 679,
681, 687,691, 694, 697, 700, 703, 727, 732, 735, 738, 741, 744, 747, 750, 753, 795, 819-20, 835,
847)). In other words, the ALJ believed a *more restrictive* RFC was in order, in part to account
for Plaintiff's right knee pain and osteoarthritis.

Plaintiff refers the Court to portions of her Function Reports and specific medical records
that she submits demonstrate inadequate consideration of her knee impairment. For instance, she
notes that on December 3, 2019, she presented to Dr. Coomber with chronic knee pain
aggravated by morbid obesity. (*Id.* at 614). In that record, Dr. Coomber conducted a physical
examination and found that Plaintiff's right knee did not show "discoloration or contusion,
effusion, or instability of patella." (*Id.* at 615). However, he assessed right knee pain and refilled
Plaintiff's prescription of 800 milligram dosage of Ibuprofen, explaining that the "[s]ide effects
of [the] drug would appear to impose practical limits on usage." (*Id.*). Notably, the ALJ cited this
treatment record by Dr. Coomber throughout her decision, though she did not discuss in detail
the contents as they relate to Plaintiff's right knee impairment. (*See id.* at 230-241).

Plaintiff also points to two treatment records that the ALJ did not reference. First, she
cites a January 31, 2020 record from Mirza Moazam Beg, M.D., in which Dr. Beg assessed right
knee pain related to osteoarthritis. (Doc. 17 at 16 (citing AR at 603)). At that time, Dr. Beg
described Plaintiff's knee pain as a "new problem" and prescribed topical cream. (AR at 603).
Second, Plaintiff references a September 30, 2020 treatment note in which PA Eric Hardy
relayed Plaintiff's statement that "her knees sometimes do bother her." (Doc. 17 at 16 (citing AR

at 841)). PA Hardy explained that his review of x-rays from 2016 and 2019 showed that Plaintiff "does already have significant bone-on-bone degenerative changes of bilateral knees." (AR at 841). PA Hardy advised Plaintiff that evaluation for her knee would require new weightbearing x-rays but that he would consider "interventions and treatments." (*Id*.). He noted his impression that Plaintiff would "potentially need intervention for her knees." (*Id*.). Although the ALJ did not reference this record from PA Hardy, she did reference the x-rays that he discussed therein. (*See id*. at 237).

In terms of subjective complaints, Plaintiff refers the Court to her June 2019 Function Report in which she reported difficulty sleeping and being unable to kneel or stand for long periods due to pain in her knees. (Doc. 17 at 15 (citing AR at 354, 361)). Similarly, she notes that in her March 2020 Function Report she explained that she was "severely limited" in her ability to squat, stand, walk, kneel, and climb stairs. (*Id*. (citing AR at 407)). The ALJ, for her part, referenced Plaintiff's Function Reports and noted that Plaintiff reported "difficulty walking, standing, sitting, lifting . . . and performing postural movements," but she did not detail each of the specific portions of those reports that Plaintiff cites. (AR at 237 (citing AR at 349-59, 360-68, 402-09)).

Finally, Plaintiff highlights portions of her testimony at the January 14, 2021 administrative hearing. As the ALJ discussed, Plaintiff testified to swelling in her knees and feet that makes it difficult for her to walk. (*Id*. at 44-45). In addition to elevating her legs at night, which the ALJ noted, Plaintiff also points to her testimony that she takes two fluid retention pills, which eliminate the swelling "sometimes" but "a lot of times, they don't." (*Id*. at 44).

Despite the ALJ's detailed discussion Plaintiff's subjective complaints and the medical evidence related to her knee pain, Plaintiff submits that the ALJ failed to provide "any

meaningful analysis connecting [her] subjective allegations to her impairments or to any other objective evidence." (Doc. 17 at 17). Again, Plaintiff invokes *Fernandez* to suggests that the ALJ failed to conduct a proper subjective-allegations analysis. (*Id.*). Moreover, in an apparent attempt to demonstrate harmfulness, she notes that the vocational expert testified that if an individual required an option to sit and stand at will, it would reduce the number of "marker" jobs by at least 50 percent. (*Id.* (citing AR at 48)). But the Court is not persuaded that the ALJ committed reversible error in her analysis of Plaintiff's knee pain or knee osteoarthritis. Rather, her analysis demonstrates adequate consideration of both subjective complaints and the medical record as it relates to Plaintiff's knee impairment.

Again, the ALJ recognized that Plaintiff's knee osteoarthritis was a severe impairment that significantly limits her ability to perform basic work activities. (*See* AR at 231-32). She noted that Plaintiff's knee swells and causes difficulty standing, sitting, and making other postural movements. (*Id.* at 232, 237). She considered and discussed the x-rays to which Plaintiff points, and she recited their findings. (*Id.* at 237). Critically, she acknowledged abnormal findings related to Plaintiff's knee impairments, but she also emphasized many relevant benign signs. (*See id.* at 237-38). In short, she provided valid reasons, grounded in the record, for discounting Plaintiff's allegations of disabling knee pain and offered adequate analysis linking Plaintiff's subjective complaints to the objective evidence. (*See id.* at 237 (reasoning that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms – including difficulty walking and standing and needing to frequently change between sitting and standing – were not entirely consistent with the evidence, where numerous "benign signs" were noted, and Plaintiff showed improved mobility with physical therapy)). Plaintiff does not point to evidence that would overwhelm the evidence upon which the ALJ relies. Moreover, she does not

point to the opinion of any medical source that would support a greater degree of limitation than

the ALJ's RFC, which limited her to light work with additional postural and environmental

limitations. The Court will not reverse on this ground.

### C.  Evaluation of Fibromyalgia

In her final claim, Plaintiff challenges the ALJ's step-two conclusion that fibromyalgia

was not a medically determinable impairment. (Doc. 17 at 19-22). Fibromyalgia is a chronic

rheumatic condition that in some claimants causes "long-term but variable levels of muscle and

joint pain, stiffness and fatigue." *Moore v. Barnhart*, 114 F. App'x 983, 991 (10th Cir. 2004)

(internal citation omitted)*.* A claimant can demonstrate that she has a medically-determinable

impairment of fibromyalgia by providing evidence from an acceptable medical source[8] of a

diagnosis of fibromyalgia. SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). But a

physician's diagnosis is not enough. *Id*. Rather, to qualify as a medically-determinable

impairment, a physician must diagnose fibromyalgia using one of two listed sets of criteria: the

1990 ACR Criteria for the Classification of Fibromyalgia (the 1990 ACR Criteria) or the 2010

ACR Preliminary Diagnostic Criteria (the 2010 ACR Criteria). *Id.* at *2–*3. Further, the medical

evidence must establish that the claimant meets the criteria. *Id*.

Under the 1990 ACR Criteria, the Social Security Administration may find a medically

determinable impairment of fibromyalgia if the claimant has: (1) "[a] history of widespread

pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above

and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or

low back) – that has persisted (or that persisted) for at least 3 months"; (2) "[a]t least 11 positive

---

[8] Only a licensed physician (a medical or osteopathic doctor) may provide evidence of a medically
determinable impairment of fibromyalgia. SSR 12-2p, 2012 WL 3104869, at *2.

tender points on physical examination"; and (3) "[e]vidence that other disorders that could cause the symptoms or signs were excluded." *Id*. Under the 2010 ACR Criteria, instead of relying on tender points to demonstrate the second requirement, a claimant may show that she has "[r]epeated manifestations of six or more [fibromyalgia] symptoms . . . , especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." *Id*. (footnotes omitted). The 2010 ACR Criteria do not supersede establishing a medically-determinable impairment under the 1990 ACR Criteria by demonstrating "tender points." *See id*. Instead, either avenue is available to establish a medically-determinable impairment of fibromyalgia. *Id*. (noting the ruling "provide[s] two sets of criteria for diagnosing [fibromyalgia]," either of which is sufficient to establish the impairment).

Here, the ALJ recognized that SSR 12-2p describes the evidence required to establish a medically-determinable impairment of fibromyalgia. (AR at 233 (citing SSR 12-2p, 2012 WL 3104869)). She found two requirements unsatisfied, however: (1) the presence of at least 11 positive tender points on physical examination; and (2) evidence that other disorders that could cause the symptoms or signs were excluded. (*Id*.). The ALJ did not address the alternative second requirement under the 2010 ACR Criteria: "[r]epeated manifestations of six or more [fibromyalgia] symptoms." (*See id*.). However, under either set of criteria, Plaintiff was required to show the exclusion of other disorders that could cause the symptoms or signs of fibromyalgia. Plaintiff does not contend she has made such a showing. Instead, she attempts to shift the inquiry, suggesting that the ALJ erred by not further developing the record. (Doc. 17 at 20-22).

In her opening remarks at the administrative hearing, Plaintiff's attorney indicated that Plaintiff "experiences fibromyalgia." (AR at 31). However, neither she nor Plaintiff mentioned

fibromyalgia again; nor did they at any point challenge the adequacy of the record or request a consultative examination. (*See id* at 26-49). Notably, the Tenth Circuit has held that an ALJ should "ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored, and the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004). Yet, relying upon a decision by The Honorable Laura Fashing of this District, Plaintiff maintains that an ALJ has a duty to inquiry whether a fibromyalgia diagnosis exists, even where the claimant's counsel fails to raise the issue. (Doc. 17 at 21) (citing *Gonzalez v. Berryhill*, No. CIV 17-1096 LF (D.N.M. Mar. 25, 2019)). Plaintiff asserts that in this case the record suggests a "reasonable possibility that [her] fibromyalgia existed as a medically determinable impairment, the effects of which should have been included in the RFC assessment." (*Id*. (citing AR at 233)).

With respect to the medical record, Plaintiff maintains that her treatment notes show that "she was being treated with multiple medications for fibromyalgia." (*Id*. at 19 (citing AR at 583, 621)). The records to which Plaintiff refers, however, suggest that the "[i]ndications" for two prescription medications (Lamisil and Celebrex) were *both* fibromyalgia *and* ankylosing spondylosis. (AR at 583-84). Plaintiff further contends that in late October 2019 Dr. Coomber reported that she was "taking three different anticonvulsants" to manage her fibromyalgia. (Doc. 17 at 19 (citing AR at 463)). But the referenced record shows that Dr. Coomber prescribed gabapentin for *both* fibromyalgia *and* ankylosing spondylosis, and the other two anticonvulsants, topiramate and lamotrigine, were prescribed to treat Plaintiff's bipolar disorder and chronic back pain, not fibromyalgia. (*See* AR at 463). Plaintiff refers to a treatment record from Dr. Beg, also from late October 2019. (Doc. 17 at 19 (citing AR at 621)). In that record, Dr. Beg indicates that

Plaintiff's "fibromyalgia is fairly controlled with current regiment of gabapentin." (AR at 621).

But, again, Plaintiff was prescribed gabapentin to treat *both* fibromyalgia *and* ankylosing

spondylosis. (*See id*. at 463). Plaintiff asserts that in an earlier treatment record, from October 23,

2018, "it was noted that [her] 'Ankylosing Spondylitis and Fibromyalgia are the principal

conditions causing pain.'" (Doc. 17 at 19 (quoting AR at 626)). But Plaintiff's abbreviated

quotation is misleading, as the record states: "She says she is getting assistance with appealing

the initial denial of her application for Disability benefits. The bases for her Social Security

Disability claim: Ankylosing Spondylitis and Fibromyalgia are the principal conditions causing

pain." (AR at 626).

The Commissioner insists that "many if not most of Plaintiff's alleged fibromyalgia

symptoms were just as equally attributable to other impairments." (Doc. 21 at 11). The record

bears this out. As noted above, in the records Plaintiff cited, her symptoms and assessment plans

for fibromyalgia and ankylosing spondylosis were treated collectively. Further, in her

administrative hearing testimony, Plaintiff attributed her symptoms, such as stiffness in her

joints, to ankylosing spondylosis, not to fibromyalgia. (*See* AR at 33-34). And, once again,

neither Plaintiff nor her attorney requested further development of the record with respect to

fibromyalgia. (*See* AR at 26-49).

Under these circumstances, the ALJ found no evidence of exclusion of other disorders

that could cause fibromyalgia symptoms or signs. Given the undeniable overlap between

Plaintiff's treatment for fibromyalgia and ankylosing spondylosis, which is documented

throughout the record, the Court is satisfied that the ALJ's finding was supported by substantial

evidence. The ALJ determined that she had enough information to make a disability

determination without a consultative examination, and Plaintiff has not pointed to objective

evidence in the record that would suggest a medically-determinable impairment of fibromyalgia *in addition to ankylosing spondylosis* would have a material impact on the disability decision here. The Court will not reverse on this ground.

## V.  CONCLUSION

Having conducted a thorough review of the administrative record, the Court concludes that the ALJ applied the correct legal standards and that her findings were supported by substantial evidence. Plaintiff's arguments to the contrary are not well-taken. Accordingly, Plaintiff's Motion to Reverse and Remand for a Hearing with Supporting Memorandum (Doc. 17) is **DENIED**.

_____
**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**